UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| MIR S. IQBAL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:12 CV 56 |
| ) | |
| TEJASKUMAR M. PATEL, WARREN ) | |
| JOHNSON, S-MART PETROLEUM, ) | |
| INC., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| WARREN JOHNSON, S-MART ) | |
| PETROLEUM, INC., ) | |
| ) | |
| Counter Claimants, ) | |
| ) | |
| v. ) | |
| ) | |
| MIR S. IQBAL, ) | |
| ) | |
| Counter Defendant ) | |

**OPINION AND ORDER**

This matter is before the court on defendants Warren Johnson and S-Mart

Petroleum ("defendants") Inc.'s motion for summary judgment. (DE # 23.)

I.   **Background and Facts**

Plaintiff Mir Iqbal ("Iqbal") was a partner in S-M-1 Acquisition Corp ("S-M-1").[1] (DE # 23 at 3.) In March of 2007, Iqbal was approached by defendant Warren Johnson, the president of S-Mart Petroleum ("S-Mart"), and Johnson's real estate broker, S.P Singh, who recommended that Iqbal purchase a gas station in Lafayette, Indiana ("the gas station"). (DE # 1 at 3.) Through his company, S-M-1, Iqbal purchased the gas station. (*Id.*) S-M-1 then entered into a Motor Fuel Sales Agreement with S-Mart. (*Id.*) In the agreement, S-M-1 agreed to purchase at least 120,000 gallons of motor fuel per month from S-Mart from April 1, 2007 until March 31, 2013. (DE # 23 at 3.) Iqbal and Ali Ahmed[2] signed a personal guaranty in connection with the Motor Fuel Sales Agreement. (*Id.* at 4.)

Iqbal, who lived in Illinois at the time that he purchased the gas station, had no intention of running the gas station himself. (DE # 1 at 3.) Around the time that Iqbal purchased the gas station, defendant Johnson and Singh introduced Iqbal to Tejaskumar Patel. (*Id.*) After being introduced to Patel, Iqbal and Patel entered into an agreement

---

[1] The following facts, which will be construed in the light most favorable to Iqbal, are taken from Johnson and S-Mart's statement of undisputed facts (DE # 23 at 3), which Iqbal has incorporated into his response to Johnson and S-Mart's motion for summary judgment (DE # 36 at 2), Iqbal's affidavit attached to his response to Johnson and S-Mart's motion for summary judgment (DE # 35-1), and the factual allegations in Iqbal's verified complaint (DE # 1). *See Ford v. Wilson*, 90 F.3d 245, 246-47 (facts in verified complaints declared true under the penalty for perjury treated the same as facts in an affidavit).

[2] Ahmed was also a partner in S-M-1. (DE # 23-2 at 1.)

2

whereby Patel would have complete operational and financial control over the gas station. (*Id.*) After Patel began running the gas station and the gas station had received gas from S-Mart, S-M-1 failed to pay for the gas as set out in the Motor Fuel Sales Agreement. (DE # 23 at 4.) Johnson allowed Patel to skip gas payments for five consecutive weeks, but Iqbal had no knowledge of this practice until after the five-week period was over. (DE # 1 at 4.) At that point, Patel left his position at the gas station, and Johnson stopped delivering the gas. (*Id.*)

By October 1, 2008, the unpaid amount owed on the gas totaled $67,829.58. (DE # 23 at 4.) S-Mart eventually filed suit against S-M-1, Iqbal, and Ali Ahmed in Indiana state court to recover the money it was owed under the Motor Fuels Sales Agreement. (*Id.*) On April 14, 2009, the Tippecanoe Superior Court, entered summary judgment in favor of S-Mart. (*Id.*; *see also* DE # 23-5.) On October 1, 2009, S-Mart entered into a settlement agreement with Iqbal, S-M-1, and Ali Ahmed to settle the judgment from the Tippecanoe Superior Court. (DE # 23 at 4; *see also* DE # 23-1 at 18-19.) Pursuant to the settlement agreement, Iqbal, M&U, LLC,[3] and SGTC II, Inc.[4] executed a promissory note payable to S-Mart in the amount of $75,000.00. (DE # 23-4 at 5; DE # 23-1 at 18-19.) Additionally, SGTC, II, Inc. entered into a new Motor Fuel Sales Agreement with S-Mart. (DE # 23 at 5; DE # 23-1 at 18-19.)

---

[3] Iqbal is the sole member and sole manager of M&U, LLC. (DE # 23 at 6.)

[4] Iqbal is the president and majority shareholder of SGTC II, Inc.. (DE # 24 at 2-3.)

On August 25, 2009, M&U, LLC purchased the gas station and real estate that S-M-1 had owned.[5] (DE # 23 at 6.) M&U, LLC executed a mortgage in favor of S-Mart on October 1, 2009. (*Id.*) The mortgage granted S-Mart a first mortgage lien on the gas station located at the Lafayette property M&U, LLC had purchased. (*Id.*; DE # 23-2 at 37-49.) S-Mart eventually filed suit against Iqbal, M&U, LLC, and SGTC II, Inc. in Tippecanoe Superior Court to enforce the settlement agreement, collect on the promissory note, foreclose the mortgage, and collect damages for breach of the second Motor Fuel Sales Agreement. (DE # 23 at 7; DE # 23-6 at 1.) On June 28, 2010, the Tippecanoe Superior Court entered summary judgment in favor of S-Mart and against Iqbal, M&U, LLC, and SGTC II, Inc.. (DE # 23 at 7.) That summary judgment order included an order of foreclosure on the gas station. (DE # 23-8 at 4.) On October 6, 2010, M&U, LLC filed for bankruptcy. (*Id.* at 8.) On December 1, 2011, the bankruptcy court approved an agreement between M&U, LLC and S-Mart to lift the automatic bankruptcy stay on the gas station. (*Id.*; *see also* DE # 23-11.) On March 7, 2012, a Sheriff's sale was held and the gas station was sold to Big Boom, Inc.. (DE # 23 at 9.)

In January 2012, Iqbal learned from J.P. Singh that defendants Patel and Johnson were doing business together at several other gas stations throughout Indiana. (DE # 35-1.) Up until that point, Iqbal was unaware that Johnson and Patel knew each other. (*Id.*) Iqbal learned from Singh that Johnson and Patel had been working together

---

[5] This purchase was made through a Sheriff's sale. (DE # 23 at 6.) Neither party addresses this issue, but it appears that the gas station and property were foreclosed on by the Bank of Indiana prior to the sheriff's sale. (DE # 23-1 at 34-35.)

with the goal of running Iqbal's gas station into the ground, so Johnson could foreclose on the property. (*Id.*) After learning this information, Iqbal filed the present suit, alleging Civil Rico violations, fraud, and unjust enrichment. (DE # 1.) Defendants Johnson and S-Mart have now moved for summary judgment on all of Iqbal's claims.[6] (DE # 23.)

## II.   Analysis

Although neither party raises this matter in their briefs, the court must address the issue of subject matter jurisdiction. *Wernsing v. Thompson*, 423 F.3d 732, 743 (7th Cir. 2005) ("[N]ot only may the federal courts police subject matter jurisdiction *sua sponte,* they must." (citation and quotation omitted)). Specifically, the court must address the impact of the *Rooker-Feldman* doctrine on the facts of this case. *Crawford v. Countrywide Home Loans, Inc.*, 647 F.3d 642, 646 (7th Cir. 2011) ("The district court correctly considered the *Rooker–Feldman* doctrine *sua sponte* . . . .").

"*Rooker–Feldman* prevents the lower federal courts from exercising jurisdiction over cases brought by state-court losers' challenging state-court judgments rendered before the district court proceedings commenced." *Brown v. Bowman*, 668 F.3d 437, 442 (7th Cir. 2012) (citation and quotation omitted). "The reason, quite simply, is that no matter how erroneous or unconstitutional the state court judgment may be, only the

---

[6] The third defendant in this case, Tejaskumar Patel, did not move for summary judgment. The analysis outlined below, however, applies equally to Iqbal's claims against Patel.

Supreme Court of the United States has jurisdiction to review it." *Id.* The *Rooker-Feldman* doctrine bars claims in two situations:

> The first involves a plaintiff's request of a federal district court to overturn an adverse state court judgment. The second, and more difficult instance, involves federal claims that were not raised in state court or do not on their face require review of a state court's decision. *Taylor,* 374 F.3d at 532–33. In this latter instance, *Rooker–Feldman* will act as a jurisdictional bar if those claims are "inextricably intertwined" with a state court judgment. *Id.* at 533. Though sometimes understandably labeled a "metaphysical concept," the thrust of the "inextricably intertwined" inquiry asks whether "the district court is in essence being called upon to review the state-court decision." *Id.; see also Young v. Murphy,* 90 F.3d 1225, 1231 (7th Cir. 1996) ("[C]onstitutional claims that are 'inextricably intertwined' with state court judgments of necessity call upon the district court to review the state court decision and are thus beyond the district court's jurisdiction."). The determination of whether a federal claim is "inextricably intertwined" hinges on whether it alleges that the supposed injury was caused by the state court judgment, or, alternatively, whether the federal claim alleges an independent prior injury that the state court failed to remedy. *See Long v. Shorebank Dev. Corp.,* 182 F.3d 548, 555 (7th Cir. 1999).

*Id*.

Even if a court concludes that a claim is "inextricably intertwined" with a state court judgment, the court must still consider whether the plaintiff "did or did not have a reasonable opportunity to raise the issue in state court proceedings." *Id.* (citation and quotation omitted). "If the plaintiff could have raised the issue in state court, the claim is barred under *Rooker–Feldman*."*Id.*

Two Seventh Circuit cases illustrate these principles. In *Taylor v. Federal National Mortgage Association*, the plaintiff's home was foreclosed on in state court, and instead of appealing that judgment, the plaintiff sued multiple defendants, including the mortgage company that foreclosed on her home and the law firm that handled the

6

matter, in state court. 374 F.3d 529, 531-32 (7th Cir. 2004). The defendants then removed the case to federal district court. *Id.* In her complaint, the plaintiff alleged that the defendants had engaged in a conspiracy to deprive her of her home, and that they had committed a fraud upon the court in the process. *Id.* at 532-34. The plaintiff also brought claims under the Equal Credit Opportunity Act (ECOA), and 42 U.S.C. § 1985. *Id.* at 532. The relief that the plaintiff sought was the return of her home and punitive damages. *Id.* at 533. The district court concluded that it lacked jurisdiction over the suit under *Rooker-Feldman*. *Id.* at 532.

The plaintiff appealed, and the Seventh Circuit affirmed the district court's decision. With regard to plaintiff's claim that defendants had committed fraud on the court, the court noted that the relief granted when a claim of fraud on the court succeeds is that the party making the claim is relieved of the judgment. *Id.* at 533. The Seventh Circuit concluded that the plaintiff's request for the recovery of her home was "tantamount to a request to vacate the state court's judgment of foreclosure . . . ." *Id.* As for the plaintiff's claim under section 1985, the court noted that the fact the plaintiff was claiming damages in the amount of the value of her home "demonstrates that her asserted injury is the loss of her home due to the Defendants' conspiracy to deprive her of her home, not an independent injury arising from acts of the Defendants." *Id.* at 534.

In *Long v. Shorebank Development Corp.*, a former tenant sued her landlord, the landlord's parent company, and the landlord's counsel claiming she was unlawfully evicted through a state court proceeding. 182 F.3d 548, 551-53. The plaintiff brought

7

claims against the defendants in federal district court alleging violations of the Fair Debt Collection Practices Act ("FDCPA"); the Illinois Consumer Fraud and Deceptive Business Practices Act; and the Chicago Landlord Tenant Ordinance. *Id.* at 553. Additionally, the plaintiff alleged that defendants were liable for violating her rights under the Fifth and Fourteenth Amendments, breach of contract, and common law fraud. *Id.* The district court dismissed the plaintiff's complaint after concluding that *Rooker-Feldman* divested it of jurisdiction. *Id.* at 553-54.

The plaintiff appealed, and the Seventh Circuit reversed the judgment, distinguishing between the plaintiff's FDCPA claim and her constitutional claim. *Id.* at 555-60. As for the plaintiff's FDCPA claim, the court noted that the alleged FDCPA violation was "independent of and complete prior to the entry of the eviction order." *Id.* at 556. In contrast, the court concluded that plaintiff's claim under the Fifth and Fourteenth Amendments could not be considered separate from the eviction order:

> For if the proceedings in the Circuit Court resulted in her favor . . . it seems unlikely that she would have been evicted or lost all of her possessions, custody of her daughter, and her job. In essence, she would not have been deprived of her property as she complains. Even [the plaintiff] states in her complaint that [the defendants] deprived her of her property (the leased premises) by initiating and prosecuting a baseless lawsuit and by deceiving her into waiving a valid and meritorious defense. For these reasons, [the plaintiff's] pursuit of her due process claim bears a close resemblance to cases in which we have found the *Rooker–Feldman* doctrine to apply . . . .

*Id.* The Seventh Circuit ultimately reversed the district court's decision regarding the plaintiff's constitutional claim because the plaintiff did not have a reasonable opportunity to raise her claims in the state eviction proceeding. *Id.* at 557-60.

As noted above, Iqbal, in his complaint, brings three claims against defendants in this suit: Civil Rico, fraud, and unjust enrichment. (DE # 1.) The relief Iqbal requests in all three claims is possession of the gas station, monetary damages for lost business and investment, punitive damages, attorneys' fees, costs, and interest. (*Id.*) Each of the three counts Iqbal brings against defendants make clear that Iqbal's "asserted injury is the loss of [his business] due to [defendants'] conspiracy to deprive [him] of [his business], not an independent injury arising from acts of the [d]efendants." *Taylor*, 374 F.3d at 534; *see also* DE # 1 at 5 (Count I: "Plaintiff was injured in his business or property by reason of the pattern of racketeering activity, in that, he lost his investment and business operation."); *Id.* at 6-7 (Count II: "Defendants Johnson and Patel were in collusion together . . . to take over [p]laintiff's gas station."); *Id.* at 8 (Count III: "Defendants Johnson and Patel were in collusion together . . . to take over [p]laintiff's gas station . . . .").[7]

In each of Iqbal's claims, he is asking the court to grant him possession of the gas station. (*See* DE # 1.) This request is "tantamount to a request to vacate the state court's judgment of foreclosure[,]" *Taylor*, 374 F.3d at 533, and is therefore inextricably intertwined with the state court foreclosure judgment. Additionally, the fact that Iqbal is also seeking monetary damages does not change this result. *See Garry v. Geils*, 82 F.3d

---

[7] The affidavit Iqbal submitted with his response to Johnson and S-Mart's motion for summary judgment also confirms this. (*See* DE # 35-1 at 2 ("The scheme was for Patel, who was my employee and/or partner to cause my gas station to default so that Johnson can [sic] foreclose on it.").)

1362, 1370 (7th Cir. 1996) ("While the plaintiffs now maintain that they are seeking only damages, this does not affect our conclusion that the *Rooker– Feldman* doctrine bars jurisdiction over their case."); *see also Nora v. Residential Funding Co., LLC*, No. 13–1660, 2013 WL 6171046, at *2 (7th Cir. Nov. 26, 2013) ("[A] request for review of a state-court foreclosure decision that includes a claim for damages based on charges of defrauding the state court does not elude *Rooker–Feldman*."). The money damages Iqbal is seeking – to compensate him for the loss of his business and his investment – "flow[] from the foreclosure judgment itself." *Sheikhani v. Wells Fargo Bank*, 526 F .App'x 705, 706 (7th Cir. 2013).

The injury Iqbal is alleging in this case, the loss of his business and his investment in the business, was only complete when the state court entered a judgment of foreclosure. *See Geils*, 82 F.3d at 1368 ("While the plaintiffs complain that the defendants moved the proposed ditch location as an act of political retaliation against them, the injury alleged was only complete when the state court actually condemned the property. Thus plaintiffs are basically claiming injury at the hands of the state court."). Thus, like the *Long* plaintiff's constitutional claim, had the state court proceeding resulted in Iqbal's favor, it is unlikely that he would have lost his business and his investment. *Long*, 182 F.3d at 556. The court concludes, therefore, that each of

Iqbal's three claims is inextricably intertwined with the state court foreclosure judgment.[8]

Having determined that Iqbal's current claims are inextricably intertwined with the state court judgment, the court must determine whether Iqbal "did or did not have a reasonable opportunity to raise the issue in state court proceedings." *Bowman*, 668 F.3d at 442.[9] Johnson and S-Mart's argument in their motion for summary judgment is that Iqbal's current claims are barred by res judicata. (DE # 24.) In response, Iqbal argued that res judicata did not apply because he was not aware of the alleged scheme to deprive him of his business until after the two state court suits had come to an end. (DE # 35.) Thus, the court will assume Iqbal would make the same argument in advocating against the application of *Rooker-Feldman*.

"The 'reasonable opportunity' inquiry focuses not on ripeness, but on difficulties caused by 'factor[s] independent of the actions of the opposing part[ies] that precluded' a plaintiff from bringing federal claims in state court, such as state court rules or procedures." *Taylor*, 374 F.3d at 534-35 (quoting *Long*, 182 F.3d at 558.) Thus, a plaintiff cannot "rely on the deception of her opponents to demonstrate that she was not

---

[8] It is possible that granting Iqbal's requested relief would also undo the original judgment issued by the state court. Because the relief requested in Iqbal's current suit most directly undermines the second judgment, however, the court will focus on that judgment in this analysis.

[9] The Seventh Circuit has questioned the validity of the "reasonable opportunity" exception to *Rooker-Feldman*. *Kelley v. Med-1 Solutions, LLC*, 548 F.3d 600, 607 (7th Cir. 2008).

11

afforded a reasonable opportunity to raise her [claims]" in state court. *Long*, 182 F.3d at 559; *see also Beth-El All Nations Church v. City of Chicago*, 486 F.3d 286, 292 (7th Cir. 2007) ("In deciding whether [a plaintiff] lacked a reasonable opportunity to present its claims in state court, we focus on difficulties caused not by opposing parties, but by state-court rules or procedures."). "A plaintiff lacks a reasonable opportunity to raise a claim only if state court procedures have erected an impenetrable barrier that 'litigants are incapable of overcoming in order to present certain claims to the state court.'" *Hochstetler v. Fed. Home Loan Mortg. Corp.,* No. 3:12–cv–772, 2013 WL 3756502, at *3 (N. D. Ind. July 16, 2013) (quoting *Long*, 182 F.3d at 558).

In this case, there were two separate state court actions. The first, a breach of contract action filed by S-Mart against S-M-1, Iqbal, and Ahmed, was filed in Tippecanoe County Superior Court. (DE # 23-3.) That case ultimately ended with a settlement agreement between the parties, and the court entered judgment in favor of S-Mart. (DE # 23-5.) The second suit, an action seeking enforcement of the settlement agreement and foreclosure of the gas station property, was brought by S-Mart against Iqbal, M&U, LLC, and SGTC, II, Inc., in Tippecanoe County Superior Court. (DE # 23-6.) That case ended with the court entering a damages judgment against Iqbal and a judgment of foreclosure on the gas station. (DE # 23-8.) Iqbal filed an answer and affirmative defenses in both of these suits. (DE # 23-4; DE # DE # 23-7.)

Superior Courts in Indiana are not limited in their jurisdiction in either civil or criminal cases. IND. CODE § 33-29-1-1.5 ("All standard superior courts have . . . original

and concurrent jurisdiction in all civil cases and in all criminal cases[.]" Additionally, "[f]oreclosure actions are essentially equitable in nature, and trial courts have full discretion to fashion equitable remedies that are complete and fair to all parties involved." *Hochstetler*, 2013 WL 3756502, at *3 (citing *City Sav. Bank v. Eby Const., LLC*, 954 N.E.2d 459, 464 (Ind. Ct. App. 2011). "'As a general rule, any defense that shows that the mortgagee is not entitled to foreclose may be set up in an action to foreclose.'" *Id.* (citing *Ind. Law Encyclopedia* § 105). Thus, it does not appear that either the Indiana state court rules or procedures in place would have prevented Iqbal from bringing his claims in either of the state court suits.[10]

It is possible that the state court rules and procedures presented Iqbal with some obstacle to bringing his claims. But there is no evidence in the record to indicate that is the case.[11] Without any evidence indicating that a state rule or procedure prevented Iqbal from bringing his claims in state court, however, Iqbal had a "reasonable opportunity" to bring his claims in the state court foreclosure action. *See, e.g.*, *Sheikhani*, 526 F .App'x at 707 ("And no state law prevented a challenge in the foreclosure proceedings to the validity of the assignment to [defendant]. . . . The district court's dismissal thus was proper regardless of any fraud [defendant] may have committed.").

---

[10] Although Iqbal is currently bringing a civil Rico claim, "state courts have concurrent jurisdiction over civil RICO claims." *Sage Popovich, Inc. v. Colt Int'l, Inc.*, 588 F. Supp. 2d 913, 917 (N.D. Ind. 2008); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1027 n.19 (9th Cir. 2013) ("State courts do have concurrent jurisdiction over civil RICO claims . . . .")

[11] Iqbal will be given an opportunity to present arguments on this issue.

Put simply, each of Iqbal's claims in this case asks this court to review and reject the state court foreclosure judgment. But that is precisely what *Rooker-Feldman* prohibits. *Wallis v. Fifth Third Bank*, 443 F. App'x 202, 204 (7th Cir. 2011) ("Despite his argument to the contrary, some of [plaintiff's] contentions-such as his disagreement with the foreclosure judgment—ask us to review and reject rulings that the state court made against him in the foreclosure suit; as the district court correctly ruled, the *Rooker – Feldman* doctrine blocks a federal district court from entertaining those contentions."). Thus, the court concludes that barring some evidence that a state court procedure or rule prevented Iqbal from bringing his claims in state court, it lacks jurisdiction over Iqbal's claims.

Numerous other courts throughout the Seventh Circuit have reached the same conclusion in similar cases. *Nora v. Residential Funding Co., LLC*, No. 13–1660, 2013 WL 6171046, at *2 (7th Cir. Nov. 26, 2013) ("By alleging that the fraudulent assignment to [defendant] allowed it to succeed in foreclosing on her property in state court, [plaintiff] is impermissibly asking a federal district court to review and reject the state court's judgment of foreclosure of her property."); *Sheikhani*, 526 F. App'x at 706-07 ("The injury [the plaintiff] complains of on his wife's behalf—the loss of her house to foreclosure—flows from the foreclosure judgment itself. . . . The district court's dismissal thus was proper regardless of any fraud [the defendant] may have committed."); *Ross-West v. Bank of New York Mellon Corp.*, 523 F. App'x 395, 396 (7th Cir. 2013) ("No matter how the [plaintiffs] frame their complaint, the district court could not grant the

14

requested relief—a judgment declaring them to be the rightful owners of the home—without disturbing the state court's foreclosure judgment. Their suit thus challenges the adverse state judgment and is barred in federal court by *Rooker–Feldman*."); *Stanley v. Hollingsworth*, 307 F. App'x 6, 9 (7th Cir. 2009) ("[The plaintiff's] malicious-prosecution claim, and his other claims of misconduct during the state-court proceedings, ask the federal district court to rule that the state court erred in its foreclosure judgment because of the misconduct of his litigation adversaries. *Rooker-Feldman* prohibits the district court from so doing."); *Crestview Vill. Apartments v. United States Dep't Hous. & Urban Dev.*, 383 F.3d 552, 556 (7th Cir. 2004) ("A finding by the district court that defendants did, as [the plaintiff] alleges, conspire to bring unsubstantiated lawsuits would undermine the state court's implicit holding that the state action was justified."); *Downs v. Indy Mac Mortg. Services, FSB*, No. 13–cv–858, 2013 WL 5201602, at *3 (S.D. Ill. Sept. 13, 2013) ("Finally, it is clear to the Court that at the heart of [the plaintiff's] claims is her desire that this Court hold the state court judgment of foreclosure invalid. To this extent, the *Rooker–Feldman* doctrine divests this Court of jurisdiction over [the plaintiff's] claims."); *Hochstetler*, 2013 WL 3756502, at *4 ("Ordering Defendants to pay back Plaintiffs and to give them their house back would require overturning the foreclosure judgment of the state court. Therefore, the *Rooker–Feldman* doctrine prevents this Court from granting Plaintiffs' requested relief because it would require this Court to "set aside" the state court judgment.").

Because neither side has addressed the *Rooker-Feldman* issue in their briefs, however, the parties will be granted 30 days in which to respond to the analysis outlined in this order. If neither party files a brief within that time period, the court will dismiss Iqbal's claims for lack of jurisdiction. Defendants Johnson and S-Mart have also filed a counterclaim against Iqbal. Johnson and S-Mart are granted thirty days to address the issue of whether, if the court dismisses Iqbal's claims, the court retains jurisdiction over the counterclaim.[12]

## III.   Conclusion

For the foregoing reasons, the parties are given until January 27, 2014 to respond to the court's analysis in this order. If neither party responds, the court will dismiss Iqbal's claims for lack of subject matter jurisdiction. Defendants Johnson and S-Mart are also given until January 27, 2014 to file a brief explaining whether the court retains jurisdiction over their counterclaim if the court dismisses Iqbal's claims.

**SO ORDERED.**

Date: December 27, 2013

>   s/James T. Moody
>   JUDGE JAMES T. MOODY
>   UNITED STATES DISTRICT COURT

---

[12] Defendants Johnson and S-Mart have also requested attorneys' fees under IND. CODE § 34-52-1-1, which allows attorneys' fees to be awarded to the prevailing party if a claim is found to be frivolous or brought in bad faith. (DE # 8 at 17-18.) If the court dismisses Iqbal's claims under *Rooker-Feldman*, it will not reach the merits of Iqbal's claims, and a determination that Iqbal's claims were frivolous or being litigated in bad faith would be inappropriate.